## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PENNEY'S CONSTRUCTION COMPANY, LLC, | ) | 3:22-CV-00524 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DUCCI ELECTRICAL CONTRACTORS, INC., | ) | |
| *Defendant*. | ) | July 18, 2024 |

### <u>RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

In this action, Plaintiff Penney's Construction Company, LLC ("Penney's"), the subcontractor on a federally-funded roadwork project, alleges that Defendant Ducci Electrical Contractors, Inc. ("Ducci"), the general contractor on the project, intentionally discriminated against it on the basis of race when it terminated Penney's from the project and hired another subcontractor.  Plaintiff brings racial discrimination claims pursuant to 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, in addition to a common law breach of contract claim and a claim for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*  Defendant brings counterclaims for breach of contract and anticipatory breach by repudiation.  Am. Answer, ECF No. 20 at 10.

Defendant seeks summary judgment on all of Plaintiff's claims, contending Plaintiff has not established a material factual dispute, primarily regarding whether Ducci intentionally discriminated on the basis of race.

For the reasons set forth below, Defendant's motion is GRANTED.

## I.       FACTUAL BACKGROUND[1]

On May 5, 2021, Defendant, a general contractor, prepared and filed a bid to perform the work necessary to complete a project, entitled Coordinated Traffic Signal System ("CTSS") and Connected Vehicle Technology – Phase I, State Project No. 0070250 (the "Project"), for the Connecticut Department of Transportation ("ConnDOT").  Pl.'s L.R. 56(a)2 St. ¶ 3.  It was awarded the contract, as it was the low bidder.  *See id.*

By regulation, companies engaged in certain transit projects funded at least in part by the federal government must engage the services of Disadvantaged Business Enterprises ("DBEs").  49 C.F.R. § 26.  A DBE is a "for-profit small business concern – (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged; and (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5.  For the Project, Ducci was required to utilize one or more DBEs to perform work with more than 6% of the value of the Project contract.  Pl.'s L.R. 56(a)2 St. ¶ 4.  Ducci was entitled to use any DBE it chose, regardless of price, subject to certain requirements.  *Id.* ¶ 7.  Accordingly, Ducci solicited bids from various DBEs based on the list of DBEs compiled by ConnDOT.  *Id.* ¶ 3.

Penney's is a DBE as that term is used and defined in 49 C.F.R. § 26.5; it is owned by Preston Neal, a Black man.  *Id.* ¶ 2.  Penney's submitted a bid to Ducci to perform specific items of work on the Project relating to concrete curbing, sidewalks, and ramps.  *Id.* ¶ 9.  Another DBE, Star Construction Corporation ("Star"), which is owned by a white female, also provided a bid to Ducci.  *Id.* ¶ 8.  Plaintiff was selected for the Project and, on June 28, 2021, electronically signed

---

[1] The factual background is taken primarily from Plaintiff's Local Rule 56(a)2 Statement, ECF No. 51-1 ("Pl.'s L.R. 56(a)2 St.").  The facts are undisputed, unless otherwise indicated.

a subcontract with Ducci.  *Id.* ¶ 5.  ConnDOT approved the requisite forms and the hiring of Penney's, which was required before work could commence.  *Id.* ¶¶ 11, 13.

Over the course of the next several months, numerous issues arose between Penney's and Ducci regarding the scope of work to be performed by Penney's, resulting in no work being performed by Penney's on the Project at any time through February 2, 2022.  *Id.* ¶ 25.  The largest issue appears to have been the use of concrete that was precast, as opposed to being poured or cast in place.  There is no dispute that pour-in-place concrete is more expensive.  Penney's contends that the contract initially allowed for all precast concrete curbing, which was the basis for its bid. *See* Def.'s Mot. for Summ. J. App'x, ECF No. 40-1 at 108, 111, Neal Tr. 22:2–19, 33:12–21. Penney's claims that, after the contract was signed, and a few weeks after their initial September 2021 meeting, the scope of work changed when Penney's was informed of the need for more pour-in-place concrete than it had anticipated.  Neal Tr., ECF No. 40-1 at 111, 118, 145, 33:12–21, 61:23–62:3, 169:29–170:6.  This issue, in addition to the need for winter work and other issues regarding curb radii, led Penney's to request more money to complete the Project.  *Id.* at 126, 95:16–22.  For its part, Ducci contends that the Project specifications never changed, and a "fast-track schedule" provided to Plaintiff prior to signing the subcontract clearly identified "the need for winter work/concrete."  *See, e.g.*, ECF No. 40-1 at 409 (Ducci's December 13, 2021, letter to Penney's detailing Ducci's position).

On October 26, 2021, Ducci sent Penney's photos of work locations that Ducci contended would be ready for Penney's to start work on as of November 3, 2021.  Pl.'s L.R. 56(a)2 St. ¶ 21.

Penney's disputes that the sites were ready.  *Id.*; Neal Aff., ECF No. 51-2, ¶¶ 5–10.[2]  The same

day, Penney's contacted Ducci and Debra Goss, a director of the ConnDOT Office of Contract

Oversight responsible for oversight of the DBE program, stating that a change order was necessary

for the cost associated with winter conditions.  Pl.'s L.R. 56(a)2 St. ¶¶ 10, 23.

The parties' contract contains the following provision concerning the subcontractor's

failure to perform:

> If, in the opinion of the Contractor, the Subcontractor shall at any time . . . (2) fail
> or neglect in any respect to prosecute the Work according to the Project Schedule
> or the Subcontract Documents; . . . [or] (4) fail to comply with any provision of this
> Subcontract or the Subcontract Documents," [Ducci could provide three calendar
> days' notice that it would, at its option] "(i) take such steps as are necessary to
> overcome the conditions, in which case the Subcontractor shall be liable to the
> Contractor for the cost thereof; (ii) terminate for default the Subcontractor's right
> to proceed under the Subcontract; or (iii) seek specific performance of the
> Subcontractor's obligations hereunder.

ECF No. 40-1 at 335.  On December 13, 2021, Ducci sent Penney's a default letter,

outlining the reasons why Ducci believed Penney's was in breach of contract, and demanding

Penney's commence work.  Pl.'s L.R. 56(a)2 St. ¶ 27.  On January 11, 2022, Ducci sent Penney's

a formal notice of intent to terminate the contract in five days, subject to the approval of ConnDOT.

*Id.* ¶ 31.  Penney's sent a letter in response, which did not raise the issue of discrimination of any

kind.  *Id.* ¶ 33.  On January 14, 2022, Ducci sent another letter acknowledging receipt of Plaintiff's

letter, referencing Plaintiff's request for a change order adding $130,000 to its subcontract, and

---

[2] Throughout the Local Rule Statement, Penney's "admits" that certain statements were made in Neal's deposition,
but denies other elements of the statements, pointing to an affidavit from Neal.  *See, e.g.*, Pl.'s L.R. 56(a)2 St. ¶¶ 42–
44.  Ducci argues that the affidavit contradicts sworn deposition testimony and is replete with inadmissible hearsay.
Def.'s Reply Br., ECF No. 54 at 1 n.1.  Although Ducci is correct that an affidavit which contradicts sworn deposition
testimony may be disregarded at summary judgment, *see Lee v. Grocery Haulers, Inc.*, No. 22-680, 2023 WL 8253089,
at *3 (2d Cir. Nov. 29, 2023) (summary order) (noting that it is "well-settled that a plaintiff cannot create an issue of
material fact by supplementing prior deposition testimony with new, inconsistent, or contradictory information in an
affidavit submitted in opposition to summary judgment"), the Court generally does not find the affidavit contradictory
to Neal's deposition testimony.  The Court need not resolve Ducci's hearsay objections, which are quite general.  Thus,
the Court has considered Plaintiff's affidavit for purposes of this decision, without opining on its admissibility.  Even
considering the affidavit, however, Plaintiff's arguments against summary judgment fail.

reiterating its intention to terminate the contract. *Id.* Ducci then formally asked ConnDOT to consent to its decision to terminate Plaintiff. *Id.* ¶ 34. On February 2, 2022, Nelio Rodrigues, a ConnDOT employee, sent an email to Ducci approving the termination of Penney's. *Id.* ¶ 35. The parties dispute whether Rodrigues had the authority to approve the termination. *Id.*

Following the termination of Penney's, Ducci hired Star, the DBE owned by a white female, to replace Penney's. This hiring, like that of Penney's originally, was approved by ConnDOT. *See* ECF No. 40-1 at 517. The scope of work for Star was slightly different, with only four items instead of five, and at a lower overall cost. *See id.* at 517–18. Penney's contends that Star was treated more favorably than Penney's—evidencing Ducci's discriminatory intent—while Ducci avers that it was not required to treat each DBE exactly the same, and that any change in the work performed by Star or the timeline was a result of the delay caused by Penney's' refusal to begin work on the Project. Penney's further contends that Ducci actually performed much of the work that was supposed to be performed by Star. Neal Aff. ¶ 53. Ducci was previously investigated and fined by the U.S. Department of Justice (DOJ) for similar behavior—essentially, hiring a DBE to fulfill regulatory requirements, while in fact performing at least some of the required work itself. *Id.* ¶¶ 48–49.

At some point, Plaintiff appealed the decision regarding its termination, and submitted a claim for discrimination, to the Federal Highway Administration (FHWA). *See* ECF No. 40-1 at 147–148. No information has been put before the Court regarding this complaint, except its general basis and the fact that the FHWA ultimately "determined there was no violation." Neal Aff. ¶¶ 37–38.

## II.      LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S.

6

at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## B.  *McDonnell Douglas* Burden-Shifting

Plaintiff's Title VI and Section 1981 race discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 159 (D. Conn. 2002) (applying *McDonnell Douglas* framework to Title VI claims); *Freckleton v. Mercy Coll. NY*, No. 22-CV-1985 (KMK), 2023 WL 2648827, at *5 (S.D.N.Y. Mar. 27, 2023) ("Claims under both Title VI and § 1981 are subject to the [*McDonnell Douglas*] burden-shifting framework . . . .").  Although the *McDonnell Douglas* framework effectively shifts the "intermediate evidentiary burdens" between the plaintiff and defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up; quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).[3]

---

[3] Both parties cite numerous Title VII cases throughout their briefing, despite that this case does not include Title VII claims.  However, given the similarity in the standards under Title VII, Title VI, and Section 1981, the Court likewise finds Title VII cases instructive and refers to them at times throughout this opinion.  *See, e.g.*, *Bryan v. Koch*, 627 F.2d 612, 619 (2d Cir. 1980) (finding Title VII cases instructive "as to the appropriate standard for challenges under Title VI"); *Perry v. Manocherian*, 675 F. Supp. 1417, 1425 n.3 (S.D.N.Y. 1987) (noting that the employment discrimination standards under § 1981 and Title VII are identical, and thus finding Title VII definitions instructive in § 1981 action).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53. The plaintiff's burden at this step is *de minimis*. *Id.* at 253 (noting that the plaintiff's burden of satisfying a *prima facie* case is "not onerous"). If the plaintiff satisfies his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged action. *Id.* at 254.

If the defendant articulates a legitimate, non-discriminatory reason for its action, the burden shifts back to the plaintiff to show that the proffered reason is "not the true reason" or is otherwise a pretext for discrimination. *Id.* at 256; *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (noting a plaintiff must show that the "real reason" for defendant's action was discrimination on the basis of protected characteristic). This final step of the *McDonnell Douglas* framework requires the court to examine the entire record—including evidence from the plaintiff's *prima facie* case, additional evidence suggesting pretext, and other evidence of the defendant's discriminatory intent—and to "determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated" against him. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Burdine*, 450 U.S. at 256 (explaining that the plaintiff's third-step burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case. *Reeves*, 530 U.S. at 148–49.

### III.     FEDERAL LAW CLAIMS:  SECTION 1981 AND TITLE VI

Plaintiff brings claims for race discrimination under two separate statutes—42 U.S.C. § 1981 and 42 U.S.C. § 2000d (Title VI).

Section 1981 provides, in relevant part, that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  In order to prove a § 1981 claim, a plaintiff has to prove:  "(1) plaintiff's membership in a racial minority; (2) defendant's intent to discriminate on the basis of race; and (3) discrimination concerning the plaintiff's ability to make and enforce contracts . . . ."  *McNeill v. People of City & State of New York*, 242 F. App'x 777, 778 (2d Cir. 2007) (summary order) (citation omitted).  A claim under § 1981 requires proof that "race was a but-for cause of [a plaintiff's] injury."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).

Similarly, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To establish a claim under Title VI, a plaintiff must prove that "(1) 'the defendant discriminated against it on the basis of [race],' (2) the 'discrimination was intentional,' and (3) 'the discrimination was a substantial or motivating factor for the defendant's actions.'"  *Bibliotechnical Athenaeum v. Am. Univ. of Beirut*, No. 21-1642, 2022 WL 710896, at *1 (2d Cir. Mar. 10, 2022) (summary order) (quoting *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001)).

Essentially, under either statute, Plaintiff must prove that it was intentionally discriminated against by Defendant.  The parties do not distinguish between the two statutes in their briefing and, given their overlap, the Court also finds it appropriate to analyze them together.  The Court first

addresses a threshold issue concerning deference to ConnDOT's approval of Ducci's request to terminate Penney's before moving onto the merits of Plaintiff's racial discrimination claims. Ultimately, for the reasons explained below, the Court grants Defendant's motion for summary judgment in full.

        A. <u>Deference to ConnDOT</u>

As a threshold matter, the Court first rejects Ducci's argument that ConnDOT's approval of Ducci's termination of Penney's has any preclusive effect here.

Federal regulations provide a procedure for the termination of a DBE by a prime, or general, contractor. As applied here, the regulations provide that Penney's could not be terminated by Ducci without the "prior written consent" of ConnDOT, and that such written consent could only be supplied if the termination was for "good cause." *See* 49 C.F.R. § 26.53(f)(1)(i), (f)(2). The regulations further specify that "[g]ood cause does not exist if the prime contractor seeks to terminate a DBE . . . so that the prime contractor can self-perform the work . . ., or so that the prime contractor can substitute another DBE or non-DBE contractor after contract award." 49 C.F.R. § 26.53(f)(3). Good cause does exist if "[t]he listed DBE subcontractor fails or refuses to perform the work of its subcontract in a way consistent with normal industry standards." 49 C.F.R. § 26.53(f)(3)(ii). However, "if the failure or refusal of the DBE subcontractor to perform its work on the subcontract results from the bad faith or discriminatory action of the prime contractor," there is no good cause. *Id.*

Throughout its motion, Defendant argues that this Court should afford some form of special deference to ConnDOT's approval of Ducci's decision to terminate Penney's, essentially suggesting that ConnDOT has already decided that Ducci did not discriminate against Penney's, and the Court must defer to that finding. *See, e.g.*, Def.'s Mot. for Summ. J., ECF No. 40 at 7

(questioning whether ConnDOT's decision can be reviewed by this Court); *id.* at 17 ("The Court should defer to ConnDOT and dismiss this action because ConnDOT decided Ducci acted in good faith when it decided to terminate Penney's."); *id.* at 20–21 (regulations should not be "second guessed by a court considering the alleged conditions and actions years after the actual occurrence"). Essentially, Defendant argues that because ConnDOT approved the termination, and because it could not have found good cause for the termination if Ducci had discriminated against Penney's, its decision should bind this Court. Other than the language of the regulation itself, Ducci provides no support for its position that ConnDOT "resolve[]d the very issue that Penney's has articulated to this Court." *See id.* at 18.

The Court does not afford preclusive effect to ConnDOT's decision. First, Defendant's argument rests on a faulty premise that ConnDOT undertook some examination of whether Defendant had discriminated against Plaintiff, when in fact it does not appear to have investigated the issue of discrimination. *See* Pl.'s Opp. Br. Ex. E, ECF No. 51-7, Goss Tr. 25:6–14 (noting that the discrimination claim was not investigated by ConnDOT and was instead sent to "Federal Highway"); *see also* Rodrigues Tr., ECF No. 40-1 at 213, 33:18–24 ("Typically my office does not [undertake an investigation to determinate whether there's been discriminatory conduct]."). While it is somewhat unclear whether Penney's even raised the possibility of discrimination to ConnDOT (*compare* Goss Tr. 24:19–20 *to* Rodrigues Tr., ECF No. 40-1 at 213–14, 33:18–34:4), Goss's testimony forecloses any argument that ConnDOT decided the precise issue facing the Court. Even if it had, however, Defendant has provided no evidence that the standards for discriminatory conduct under the federal regulation are coextensive with the Court's inquiry regarding discriminatory conduct under Title VI and Section 1981. Thus, even if ConnDOT had made a clear finding regarding discrimination—which it did not—it is not clear how much weight

11

such a finding would hold in this Court. *See, e.g.*, *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 796 (1986) (declining to give preclusive effect to "administrative proceeding at which the employing agency rejected [plaintiff's] discrimination claim," and treating *de novo* plaintiff's Title VII claim); *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 470 n.7 ("Since it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts."); *Kinkead v. Humana at Home, Inc.*, 330 F.R.D. 338, 358 (D. Conn. 2019) ("Collateral estoppel from agency action is only available if the administrative agency is acting in a judicial capacity."). The Court sees no reason to depart from this precedent. Accordingly, the Court turns to the merits of Plaintiff's claims, affording no special deference to ConnDOT's action in this case, but reviewing it as any other piece of evidence.

## B. *Prima Facie* Case

To establish a *prima facie* case under § 1981 or Title VI, a plaintiff must "present evidence to establish that they were treated less favorably than other similarly situated employees and that they were so treated because of their race." *Bridgeport Guardians, Inc. v. Delmonte*, 553 F. Supp. 601, 606 (D. Conn. 1982).[4] The employer's discriminatory intent may be "shown by direct evidence, if such exists, or by circumstantial evidence, including evidence of the difference in treatment itself, from which an inference of an unlawful motive may be drawn." *Id.*

The Court finds that Plaintiff has carried its minimal burden of making out a *prima facie* case of discrimination. It is undisputed that Plaintiff was terminated from the Project and replaced with a white female-owned DBE. At the *prima facie* stage, this is generally sufficient to raise an

---

[4] A plaintiff must also show that it is a member of a protected class; it was qualified for the position or benefit it sought to receive; and that it suffered an adverse action. *See Colon v. Fashion Inst. of Tech. (State Univ. of N.Y.)*, 983 F. Supp. 2d 277, 288 (S.D.N.Y. 2013) (§ 1981 claim); *Chance v. Reed*, 538 F. Supp. 500, 510 (D. Conn. 2008) (Title VI claim). Ducci does not challenge that Penney's meets each of these other elements.

inference of intentional discrimination in employment cases.  *See Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial *prima facie* stage of the Title VII analysis . . . .").  In addition, evidence in the record shows that the contract into which Ducci entered with Star was slightly different than the one it had with Penney's, which raises an inference of differential treatment.  *Compare* ECF No. 40-1 at 354 (CLA-12 Request to Subcontract with Penney's) *to* ECF No. 40-1 at 517 (CLA-12 Request to Subcontract with Star).  *See also Chance*, 538 F. Supp. 2d at 510 (noting that one element of a *prima facie* case under Title VI may be to show different treatment from similarly situated individuals).

### C.  Legitimate, Non-Discriminatory Reason

At the second step, the burden shifts to Defendant to articulate a "non-race based motive for its treatment" of Plaintiff.  *Bridgeport Guardians*, 553 F. Supp. at 606 (citing *McDonnell Douglas*, 411 U.S. at 802).  Defendant has met its burden here.  It asserts that it had a good faith business reason to terminate Plaintiff:  Plaintiff's undisputed failure to perform on the Project between signing the contract in June 2021 and being terminated in February 2022.  ECF No. 40 at 7–8.  The correspondence from Ducci in the record supports that Penney's failure to perform as expected was Ducci's stated rationale for the termination.  *See, e.g.*, ECF No. 40-1 at 409 (Notice to Cure).  That ConnDOT agreed with Ducci that there was no change in the scope of work, *see* Rodrigues Tr., ECF No. 40-1 at 238, 58:11–21, and concluded Ducci's termination of Penney's was supported by good cause and in compliance with ConnDOT specifications, ECF No. 40-1 at 84 (email from Rodrigues to Neal discussing approval of termination), is further evidence supporting Ducci's legitimate, nondiscriminatory rationale for termination.  As failure to perform

under the contract is clearly a legitimate reason to terminate a business relationship, Ducci has met its burden at this step.

        D. <u>Pretext</u>

Once the employer articulates a legitimate, non-discriminatory reason for its actions, the burden once again shifts to the plaintiff to "show that the reason articulated by the employer is, in fact, merely a pretext for discrimination." *Bridgeport Guardians*, 553 F. Supp. at 606 (citing *McDonnell Douglas*, 411 U.S. at 804). The Court holds that Plaintiff has not demonstrated that there are material disputes of fact as to whether Defendant's stated reason for terminating it was a pretext for racial discrimination.

First, the Court rejects Plaintiff's contention that Ducci made false representations to Plaintiff about what work was required to be performed on the contract, and that the falsity of these representations demonstrates that Defendant's ultimate termination of Plaintiff was a pretext for discrimination. *See* Pl.'s Opp. Br., ECF No. 51 at 6. Plaintiff makes numerous arguments, throughout the briefing and in the evidence submitted, that go to the nature of the contractual requirements between Ducci and Penney's. For instance, Plaintiff argues that Ducci changed the scope of work on Penney's by requiring more concrete to be poured in place than originally contracted for; that Ducci did not properly clear the work locations to enable Penney's to begin work; that Ducci did not originally advise of the need for winter work; and that Ducci in general would not provide necessary information to Penney's regarding the Project. Essentially, Plaintiff contends that Ducci "gas[lit]" Penney's by stating that Penney's was the one being difficult, when in fact it was Ducci who changed the contract. *See id.* at 10. However, even taking all of these arguments as true and construing the evidence in the light most favorable to Penney's, a problem remains with its race discrimination claims—it has put forth no evidence to demonstrate how *any*

of these contractual arguments have to do with the race of its founder, Mr. Neal.  It appears fairly clear that Ducci and Penney's did not communicate well based on the general pattern of the correspondence between them, and that disagreement and confusion arose between the parties as to the requirements of the Project, but this does not a claim for racial discrimination make.

Plaintiff's only proffer of race-based discrimination, and supposed pretext—other than the fact that it was replaced by a white female-owned DBE—is its contention that Ducci has a history of discrimination (based on a DOJ settlement regarding a DBE and Ducci's general pattern of hiring subcontractors), and that Ducci treated Star differently than it treated Penney's.  *See* Neal Tr., ECF No. 40-1 at 120–21, 71:22–73:23.[5]  The Court does not find that Ducci's history is sufficient to create a material dispute of fact as to whether Ducci's termination of Plaintiff was discriminatory.  In its DOJ settlement, the press release for which has been submitted to the Court, *see* ECF No. 40-1 at 59–60, Ducci admitted to contracting with a DBE and submitting for payments from ConnDOT when the DBE did not perform a commercially useful function ("CUF"), as Ducci was supplying the DBE with workers and equipment.  *See id.* at 60; *see also* ECF No. 40-1 at 390 (CUF "means the DBE is responsible for the execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved with its own forces and equipment."); 49 C.F.R. § 26.55(c) (describing DBE's performance of a CUF). Despite that the settlement indicates Ducci has engaged in wrongful billing practices with respect to a DBE in the past, the press release does not provide enough information to demonstrate that

---

[5] Defendant makes much of the fact that, at various points in its deposition, Penney's stated that it did not believe it was terminated based on race, and claims that based on Penney's admission to those facts, *see* Pl.'s L.R. 56(a)2 St. ¶ 37, the Court should find Penney's liable for Ducci's cost of defense, since it shows Penney's had no good faith basis for bringing this action.  *See* ECF No. 54 at 10.  Although Mr. Neal did make such statements at times in his deposition, he also testified that he *did* believe his termination and treatment was based on race.  *See, e.g.*, Neal Tr., ECF No. 40-1 at 121, 73:25-74:15.  Thus, the Court is unprepared to accept Defendant's suggestion that Penney's did not have a good faith basis for bringing this case, and rejects its invitation to award costs at this time.

Ducci has any history of *race-based* wrongful practices with respect to DBEs, or that its reason for terminating Penney's in this particular instance was merely a pretext for racial discrimination.

Similarly, Penney's presents evidence that Ducci has hired very few Black-owned DBEs in the past, and primarily subcontracts with white female-owned DBEs. *See* Pl.'s Opp. Br. Ex. D, ECF No. 51-6 at 2–22. Out of twenty-one contracts with ConnDOT going back to 2015, Ducci has only hired two Black-owned DBEs, out of about forty-five subcontractors hired. *See id.* The majority of its DBE subcontracts are with white female-owned DBEs, in addition to a number of Hispanic-owned DBEs. This statistical evidence does not carry the weight Penney's ascribes to it. Although "[s]tatistics may be used as circumstantial evidence to support an individual disparate treatment claim," the use of "statistics based on groups including persons against whom a plaintiff was not compared [is] not appropriate." *Weser v. Glen*, 190 F. Supp. 2d 384, 402 (E.D.N.Y.), *aff'd*, 41 F. App'x 521 (2d Cir. 2002). Here, the Court has no indication of whether Plaintiff, who specializes in curbing—or any other Black-owned DBE, for that matter—was competing for and did not receive any of the subcontracts listed. The Court also has no information about how many Black-owned DBEs there are to choose from, as compared to other DBEs, to be able to draw any inference that Ducci's hiring pattern is suggestive of discrimination. Further, even if the Court could draw such inferences, and recognizing that even "statistically insignificant data" can be "relevant" to discrimination claims, in this instance "more particularized evidence relating to the individual plaintiff is necessary to show discriminatory treatment." *Martinez v. Davis Polk & Wardwell LLP*, 713 F. App'x 53, 55 (2d Cir. 2017) (summary order) (citation omitted) (cleaned up); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (recognizing that "raw data purportedly describing a pattern of under-representation" was "little but an unsupported hypothesis providing no foundation for the assertion that there was discrimination in [the

plaintiff's] tenure process").  Thus, the Court does not find these statistics sufficient to create a material dispute as to Ducci's discriminatory intent against Penney's.

Likewise, the Court does not find that Penney's has shown that Ducci's treatment of Star creates a genuine dispute of material fact.  As Ducci notes, using Star as a direct comparator is inappropriate where the circumstances under which Star was hired (on a project where curbing work had not started almost eight months into the Project) differ from those under which Penney's was hired or fired.  *See Chance*, 538 F. Supp. 2d at 511 (noting that, even if plaintiff had produced evidence where "black clients were or would be treated differently from similarly situated white clients, [plaintiff] has still failed to produce evidence that someone who engaged in the type of conduct in which he admits engaging . . . was treated differently").  Although Penney's claims Star received preferential treatment, including that Ducci did more work for Star and that Star was paid more money for less work, *see, e.g.*, Neal Tr., ECF No. 40-1 at 120, 72:11–18, these ultimately amount to nothing more than conclusory allegations, as Plaintiff has put forth no evidence to substantiate these contentions.  Moreover, the evidence before the Court demonstrates that Ducci contracted with Star at a *lower* price, and for one fewer item of work.  *Compare* ECF No. 40-1 at 354 (CLA-12 Request to Subcontract with Penney's) *to* ECF No. 40-1 at 517 (CLA-12 Request to Subcontract with Star).  Plaintiff's contentions therefore amount to mere speculation that Star was more favorably treated.  *See Szewczyk v. Saakian*, 774 F. App'x 37, 39–40 (2d Cir. 2019) (summary order) ("[S]peculation cannot be used to overcome summary judgment.").

Lastly, Plaintiff claims that the procedural irregularities in the ConnDOT termination process—namely, Debra Goss not being involved in the initial termination decision—demonstrate pretext.  There is a genuine dispute over whether Plaintiff's termination was conducted in accordance with normal ConnDOT practice.  *Compare* Goss Tr. 36–37 *to* Rodrigues Tr., ECF No.

40-1 at 233–34, 53:14–54:2. However, the existence of a procedural irregularity at ConnDOT is not necessarily evidence of racial discrimination on the part of *Ducci*, and Plaintiff has not suggested that ConnDOT's actions can be imputed to Ducci or explained by Ducci's conduct. Moreover, while procedural irregularities "can raise a question as to the good faith of the process," this is only so where the "departure [from procedure] may reasonably affect the decision." *See Weinstock*, 224 F.3d at 45 (citation omitted).  Here, Plaintiff has put forth no evidence that, had the process gone through Goss instead of Rodrigues, anything would have occurred differently. Goss was carbon copied on Rodrigues's email approving the termination, *see* ECF No. 40-1 at 85, and Plaintiff had an opportunity to appeal the decision and submit responses to Ducci's termination notice.  Following this post-termination meeting with both Rodrigues *and* Goss, the result of the termination approval was unchanged.  *See* Pl.'s L.R. 56(a)2 St. ¶ 39.  Thus, there is no inference to be drawn that any procedural irregularity at ConnDOT had any impact on the termination of Plaintiff or in any way demonstrates that Ducci's proffered reason for the termination was pretextual.

Ultimately, no reasonable juror could conclude that racial discrimination was the cause of Ducci's termination of Penney's, under either § 1981's but-for causation standard, or Title VI's substantial or motivating factor standard.  *See Comcast*, 589 U.S. at 333 (§ 1981); *Bibliotechnical*, 2022 WL 710896, at *1 (Title VI).  Even drawing all reasonable inferences in favor of Plaintiff, and assuming that there was a change in the scope of work after the contract was signed or that Ducci "shifted its defenses" regarding whether such a change had occurred, *see* Pl.'s L.R. 56(a)2 St., Plaintiff's Further Statement ¶ 4; Neal Aff. ¶ 27, none of the evidence submitted supports the inference that these events had anything to do with Mr. Neal's racial identity.  The Court is left with Plaintiff's bare conclusions and unsupported speculation, which "cannot be used to overcome

summary judgment."  *Szewcyzk*, 774 F. App'x at 40.  Thus, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's racial discrimination claims.

### IV.    STATE LAW CLAIMS

Defendant also seeks summary judgment in its favor on Plaintiff's state law claims for breach of contract and violations of CUTPA.  The Court first assesses its supplemental jurisdiction before proceeding to the merits of the claims.

### A.  Supplemental Jurisdiction

Federal courts have supplemental jurisdiction over state law claims that "are so related to federal question claims brought in the same action as to 'form part of the same case or controversy[.]'"  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir 2004) (quoting 28 U.S.C. § 1367(a)).  "The fact that the district court has the power to hear these supplemental claims does not mean, of course, that it must do so;" a district court "may decline to exercise its power based on the factors laid out in 28 U.S.C. § 1367(c)."  *Id.*  Section 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over a claim if:  "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).  This determination is within the district court's discretion.  *Briarpatch Ltd.,* 373 F.3d at 308.

Even when one of the four prongs of § 1367(c) is applicable, the Court must examine whether declining to exercise supplemental jurisdiction would promote the values of "economy, convenience, fairness, and comity."  *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)).  As a

general rule, "when 'all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point towards declining to exercise jurisdiction over the remaining state law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  But even in such a situation, it may be appropriate to exercise supplemental jurisdiction "in long-pending cases presenting no novel issues of state law where 'discovery ha[s] been completed, dispositive motions ha[ve] been submitted, and the case would soon be ready for trial.'"  *Id.* at 83 (quoting *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014)).

Here, the case has been pending for more than two years; no party has suggested that the state claims involve novel issues of state law; discovery is complete; and dispositive motions have been filed.  Accordingly, the Court will exercise supplemental jurisdiction over the state law claims, despite dismissing Plaintiff's federal claims.

## B.  Breach of Contract

Plaintiff contends that Ducci breached the contract between them by "failing and refusing to provide necessary specific information after a change . . . by CT DOT in the type of concrete installation," and that Ducci "thwarted" Penney's efforts to perform.  ECF No. 51 at 21–22; *see also* Compl., ECF No. 1 at 9 (alleging that Defendant breached "when it terminated its contract with Plaintiff).

Under Connecticut law, the "elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *AGW Sono Partners, LLC v. Downtown Soho, LLC*, 343 Conn. 309, 322 (2022) (citation omitted).  The issue here is whether Ducci breached the contract when it terminated Penney's for nonperformance.

The Court finds that there is no genuine dispute of material fact as to whether Ducci breached the contract, and thus grants Defendant's motion for summary judgment on this claim. First, and importantly, it is undisputed that Plaintiff failed to perform at all under the contract, thereby failing to establish an essential element of its breach of contract claim. *See* Pl.'s L.R. 56(a)2 St. ¶ 25; *AGW Sono Partners, LLC*, 343 Conn. at 322.

Penney's contends that it is excused from its failure to perform because Ducci breached the contract by changing the scope of work for the Project, among other things. Specifically, Mr. Neal contends that an inspector from ConnDOT informed him that "80 or 90 percent of the precast curbing, which [Penney's] bidded on, was going to be eliminated or was going to be changed to a curb poured in place," which was significantly more expensive. Neal Tr., ECF No. 40-1 at 111, 33:15–34:7. Although the curbing was the primary issue between the parties, Penney's also contends that it was required to do winter work and that the job sites were not readied for it—all in breach of the contract.

Even accepting Plaintiff's version of events, it has not identified any particular provision of the subcontract it claims Ducci breached, or articulated a specific theory of breach, as it must. *See Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 296 (2014) (finding claim did not sound in breach of contract where allegations did not "refer[] to the violation of a specific contractual provision"); *Visconti v. Pepper Partners Ltd. P'ship*, No. X06CV990170072S, 2002 WL 1293224, at *7 (Conn. Super. Ct. May 14, 2002) (granting summary judgment on breach of contract claim where complaint did not "articulate the specific provision . . . which was allegedly breached"), *aff'd*, 77 Conn. App. 675, (2003). In the complaint's breach of contract count, Plaintiff merely incorporates all of the previous paragraphs and then states, in conclusory fashion, that "Plaintiff and Defendant entered into an express contract to

perform concrete constructions (*sic.*) services on CT DOT contract number 0007-0250," that "Defendant breached its contract for services when it terminated its contract with Plaintiff," and that "Plaintiff has been damaged thereby." Compl. ¶¶ 55–57. In opposition to Defendant's summary judgment motion, Plaintiff has done no better in identifying a particular provision of the parties' nearly thirty-page subcontract that it claims Defendant breached. *See* ECF No. 40-1 at 321–48 (subcontract). A party's obligation to perform under a contract "is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Pursuit Partners, LLC v. Reed Smith, LLP*, 198 Conn. App. 1, 16 (2020) (citation omitted). Plaintiff has not identified *any* particular contract provision that Ducci breached—much less a breach that is so substantial it would fully excuse Plaintiff from performing under the subcontract.

Moreover, the subcontract includes terms that seem to undermine Plaintiff's unspecified theory of breach. For instance, it provides that the drawings and specifications included in the subcontract "may not be fully developed and the Subcontractor agrees to perform all work which may not be specifically mentioned in these documents." Subcontract Art. 2 ¶ e, ECF No. 40-1 at 327. The subcontractor alone was responsible for the "layout" of its work, and was required to report any site defects to the contractor and allow it time to remedy those defects. Subcontract Art. 4 ¶ b, ECF No. 40-1 at 328. In addition, the contractor is permitted to "unilaterally . . . make Changes in the Work," which allows the subcontractor to request a change order but nonetheless requires it to "immediately perform the Work as changed without delay." Subcontract Art. 8 ¶ b, ECF No. 40-1 at 333. Regarding timing of performance, the subcontractor was to "promptly commence" its work when directed by the contractor and "prosecute the Work in a prompt and diligent manner in accordance with the Project Schedule," which could be amended by the

contractor.  Subcontract Art. 6 ¶ a, ECF No. 40-1 at 329.  It further provides that the subcontractor

is bound by the Project's schedule and that the contractor, in its "sole and absolute discretion" can

"change the time, order and priority in which the various portions of the Work shall be performed,"

and that the subcontractor shall not have a right to any additional costs associated with such a

change.  Subcontract Art. 3 ¶¶ b, c, ECF No. 40-1 at 328.  If, in the "opinion" of the contractor,

the subcontractor failed to perform or comply with a contract provision, it may terminate the

contract.  Subcontract Art. 10 ¶ a, ECF No. 40-1 at 335.  In short, the contract seems to contemplate

that Ducci could "unilaterally" change the scope of work, and terminate Penney's for its failure to

perform the work as changed on the schedule Ducci implemented.

Considering the subcontract's plain language, the undisputed fact that Penney's did not

perform any work before its termination, *see* Pl.'s L.R. 56(a)2 St. ¶ 25, and Plaintiff's failure to

even articulate a specific theory of breach, the Court finds summary judgment in Defendant's favor

is appropriate.  Not only is there no genuine dispute of material fact as to whether Plaintiff

performed, as it was required to do even with a changed scope of work, but there is no genuine

dispute on this record as to whether Ducci was the breaching party.[6]  *See Foster v. Indian Harbor*

*Yacht Club, Inc.*, No. FSTCV176034154S, 2018 WL 3715651, at *7 (Conn. Super. Ct. July 17,

2018) (dismissing breach of contract count where plaintiff did not assert his own "performance (or

excuse from performance) of relevant provisions" of the contract); *Country Holding Co., LLC v.*

*Covanta Projects of Wallingford, LLC*, No. X08-FST-CV-216054488, 2024 WL 2826528, at *9

(Conn. Super. Ct. May 28, 2024) (granting summary judgment in favor of defendant in part

---

[6] To the extent Plaintiff means to suggest that Ducci breached the contract because it discriminated against Penney's on the basis of race, as it was obligated not to do, *see* Subcontract App'x A ¶ 2 (ECF No. 40-1 at 371), this theory of breach is rejected for the same reasons discussed above in Section III—Plaintiff's failure to demonstrate a genuine issue of material fact regarding whether Ducci discriminated against it.

because plaintiff "failed to identify a specific provision of the [contract] that imposed an obligation on [defendant] and was breached").

Accordingly, Defendant's motion is GRANTED with respect to the breach of contract claim.

### C.  CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  "It is well settled that in determining whether a practice violates CUTPA," Connecticut courts look to "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227–28 (2010) (citation omitted) (alteration in original).  In general, a simple breach of contract, without more, is insufficient to establish a CUTPA violation.  *See id.* at 227 (upholding trial court's determination that breach of contract case "lack[ing] unethical behavior or other aggravating factors" rose to the level of a CUTPA violation); *Med. Device Sols., LLC v. Aferzon*, 207 Conn. App. 707, 778 (2021) (noting that a "absent substantial aggravating circumstances, a simple breach of contract is insufficient to establish a claim under CUTPA," and citing cases) (cleaned up) (citation omitted).

As the Court has already determined above that there are no genuine disputes with respect to whether Ducci discriminated against Penney's, or breached the contract with Penney's, Plaintiff's CUTPA claim also fails on those bases, as there is no unfair practice alleged beyond Plaintiff's other claims.  *See Country Holding Co.*, 2024 WL 2826528, at *29–30 (granting

summary judgment in favor of defendant on CUTPA claim premised on rejected breach of contract claim, and collecting cases).  Even if the Court had found in favor of Penney's on the breach of contract claim, the Court cannot say that Penney's has pointed to "unethical behavior or other aggravating factors" that would sustain its CUTPA claim, where there was simply confusion regarding the requirements of the project specifications.  *See Naples*, 295 Conn. at 227.  The sole case cited by Plaintiff regarding its CUTPA claim, *Bridgeport Restoration Co. v. A. Petrucci Const. Co.*, 211 Conn. 230 (1989), is inapposite as, in that case, the court found that the general and subcontractor had entered into an oral contract before bidding, which the defendant sought to change after winning the overall contract bid.  *Id.* at 231.  Here, there is no dispute that the parties entered into a contract.  The dispute is only as to what that contract required, and Plaintiff has elicited no evidence from which a reasonable jury could conclude that Defendant acted unfairly or unethically with respect to its interpretation and action on those issues.  Accordingly, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's CUTPA claim.

## V.    CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED in its entirety as to Plaintiff's claims.

No party sought summary judgment with respect to Defendant's counterclaims for breach of contract and anticipatory breach of contract.  Defendant advised that, if its motion for summary judgment was granted, it would discontinue prosecution of its counterclaims.  *See* ECF No. 57. Accordingly, Defendant shall file a notice by **July 25, 2024**, either (1) requesting dismissal of its counterclaims pursuant to Federal Rule of Civil Procedure 41(a)(2); or (2) signaling its intention to proceed with its counterclaims, and providing support for the Court's continued jurisdiction

over the counterclaims.   Should Defendant request dismissal of the counterclaims, the Court intends to grant that request and will proceed to entering judgment for Defendant and closing this case.

**SO ORDERED** at Hartford, Connecticut, this 18th day of July, 2024.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE